# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 5, 2010 Session

## JUSTIN MATHIS v. STATE OF TENNESSEE

### Direct Appeal from the Criminal Court for Shelby County
### No. 04-06495     Carolyn Wade Blackett, Judge

---

### No. W2010-00704-CCA-R3-PC  - Filed May 11, 2011

---

A jury convicted the petitioner, Justin Mathis, of first degree murder.  The trial court sentenced him to life imprisonment.  On direct appeal, this court upheld the petitioner's conviction and sentence.  The petitioner filed a petition for post-conviction alleging ineffective assistance of counsel.  The post-conviction court denied relief, and the petitioner now appeals.  Following a review of the parties' briefs, the record, and applicable law, we affirm the denial of post-conviction relief.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Brooks, Memphis, Tennessee, for the appellant, Justin Mathis.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Brook Yelverton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Shelby County grand jury indicted the petitioner, Justin Mathis, for one count of first degree murder.  The trial court held a jury trial, and the evidence, as summarized in this court's opinion on direct appeal, was as follows:

This case relates to the [petitioner]'s shooting seventeen-year-old Vernon Edwards on the night of Monday, April 5, 2004.  Nineteen-year-old Chan Martin testified that the victim was his best friend.  On April 5, 2004,

Martin got out of school about 1:30 p.m. and went to the victim's house. Martin and the victim worked at a Wendy's restaurant, and Martin had to be at work at 3:00 p.m., but the victim had the day off. After visiting with the victim, Martin went to work. About 7:00 p.m., Martin took a thirty-minute break and went to Shontae Handy's house near Wendy's. The victim and some other friends were there, and Martin sat outside and talked with them. Martin then drove back to Wendy's in his Pontiac Grand Am and saw the [petitioner] and a group of males sitting in the parking lot. Martin testified that on the night of Saturday, April 3, 2004, he and some friends had gotten into a fight with one of the [petitioner]'s friends. The next night, Sunday, April 4, someone broke out the back window in Martin's Grand Am, flattened his tires, and tried to set his car on fire. When Martin saw the [petitioner] and the other males at Wendy's on April 5, he believed they were there to retaliate against him for the fight. Martin left Wendy's, telephoned the victim, and told the victim about the [petitioner]'s being at the restaurant. While Martin was driving around, he saw the [petitioner]'s green Mazda 626 traveling in the opposite direction. Martin returned to Wendy's, did not see the [petitioner] or the other males, and went inside to work. Seconds later, the victim telephoned the [petitioner] and said, "[T]hey out here." The victim hung up the telephone, and Martin heard gunshots a couple of seconds later. He looked out the window and saw the victim walking in the parking lot and holding his chest. Martin jumped over the restaurant counter, ran outside to the victim, and caught the victim as he fell. The victim was bleeding and holding his chest, and Martin lay down on the ground with him. He stated that he spoke with the police after the shooting, that the police showed him a photographic array on April 7, and that he identified the [petitioner] from the array as the driver of the green Mazda.

On cross-examination, Martin testified that on the night of April 3, 2004, he, Tommy Walker, and the victim fought the [petitioner]'s friend, Karin. Martin acknowledged that Karin "got whooped pretty good." No weapons were involved in the fight, and although the [petitioner] was sitting in his car during the fight, he did not participate. On Monday morning, April 5, Martin discovered the damage to his car. Martin stated that he did not know the [petitioner] and had never had a conflict with him. However, Martin had "seen [the petitioner] around" and had had previous conflicts with some of the [petitioner]'s friends. At first, Martin testified that he did not remember telling the police that Jeremy Love was in the Mazda with the [petitioner] on the night of the shooting. However, he later acknowledged that he identified Love's picture from a photographic array and that he identified Love as being in the

green Mazda. He stated that a third boy also was in the Mazda at the time of the shooting. He said that he, the victim, and Walker were not members of a gang. On redirect examination, Martin testified that he did not see the green Mazda after the shooting but that he was focused on the victim and did not look around.

Andiea Walker testified that on the night of April 5, 2004, she was working at Wendy's with Chan Martin. While Martin was taking a break, six males came into the restaurant looking for him, which Walker thought "was kind of weird." She stated that the [petitioner] and Jeremy Love were in the group and that she telephoned Martin to warn him but that he did not answer his telephone. As soon as Walker hung up her telephone, Martin came into the restaurant, and Walker was relieved to see him. She stated that she started to walk outside to her car and that she saw flashes, heard gunshots, and got down on the ground. She ran outside into the parking lot and saw a dark-colored four-door car pull away. She also saw the victim lying on the ground on his stomach. Martin rolled the victim over, and Walker saw that the victim had been shot in the chest. On cross-examination, Walker testified that the six males in the group were all African-American[s] and that they wanted to know where Martin and the victim were. She stated that at that time, she did not know the [petitioner]'s and Jeremy Love's names and that someone told her their names after the shooting.

Shaun Bullock testified that on the evening of April 5, he was at Shontae Handy's house with some of his friends, including the victim and Dante Johnson. The victim and Johnson asked Bullock to drive them to Wendy's, so Bullock drove them and Eric Richmond to the restaurant in Bullock's white Nissan Maxima. When they pulled up to Wendy's, Bullock saw Chan Martin's white Grand Am parked in the parking lot and saw a male leaning into Martin's car through the window. Johnson and the victim got out of Bullock's car and ran toward Martin's car. Bullock heard them shouting, "[W]hat you doing in my partner's car[?]" A green Mazda 626 parked beside Martin's car started to pull away, and Bullock heard eight to ten gunshots. He stated that he could not see who fired the gun but that the gunshots came from the front of the Mazda. He stated that four or five people were in the Mazda.

On cross-examination, Bullock testified that he was not present at the fight on April 3 and did not know Chan Martin. On the night of the shooting, the male leaning inside Martin's car got into the Mazda just before the shooting. The Mazda pulled away from Martin's car, the victim ran toward the

Mazda, and someone shot the victim. Bullock stated that the victim and Johnson were unarmed. He said he did not remember testifying at the preliminary hearing that he could not see the victim at the time of the shooting. At first, Bullock thought the gunshots came from the Mazda's passenger side. However, he testified at trial that he could not be sure. He said that he did not know how many people in the Mazda were firing guns and that he did not see the victim get shot.

Eighteen-year-old Dante Johnson testified that he was at Shontae Handy's house on the evening of April 5. Later that night, Shaun Bullock drove Johnson, Eric Richmond, and the victim to Wendy's. During the drive, the victim received a telephone call from Chan Martin. When Bullock pulled into the Wendy's parking lot, Johnson saw a green Mazda 626 parked beside Martin's car and saw a male "messing with Chan's car." Johnson and the victim got out of Bullock's car and asked the male what he was doing. Johnson stated that the victim said something like "what you doing in our partner's car[?]" He said that the male "hopped" into the Mazda and that the Mazda pulled away. Johnson thought he heard the driver of the Mazda say, "Get you one." Johnson and the victim approached the Mazda, and six to nine shots "rang out." Johnson ducked behind a nearby building and saw the victim standing up with his shirt covered in blood. The victim took a couple of steps and dropped to the ground. Johnson ran to him, and the victim was gasping for air. Johnson said the gun used to shoot the victim was black and looked like a small, semi-automatic.

On cross-examination, Johnson testified that as Bullock drove to Wendy's, Johnson was sitting in the rear passenger seat, Eric Richmond was sitting in the front passenger seat, and the victim was sitting behind Bullock. Bullock parked in the Dollar Store parking lot beside Wendy's, and Johnson and the victim walked, not ran, toward the Mazda. He said that he did not see the victim get shot, that he was not a gang member, and that he did not know if the victim was a gang member.

Twenty-two-year-old Shontae Handy testified that on the evening of April 5, she was outside her house with some friends. Handy and her friend Tamara Burrows decided to go to Wendy's to get something to eat, and Handy drove Burrows and two other girls to Wendy's in Handy's green Mitsubishi Montero. While they were turning in the parking lot, a green Mazda drove beside them, and Handy heard some people in the Mazda say, "There they go. There they go." Handy looked to see who the people in the Mazda were

-4-

talking about and saw the victim. She stated that the Mazda's driver told the victim, "Come get you one," meaning a bullet. As the victim walked toward the Mazda, the driver shot the victim and drove away. Handy stated that she did not see anyone other than the driver with a weapon. On cross-examination, Handy testified that she was a close friend of the victim but that she did not know if the victim was a gang member. After Handy heard someone in the Mazda say, "There they go," Handy heard the victim say, "Here we go." Handy denied telling the police that she was inside Wendy's at the time of the shooting; denied telling anyone that she heard someone in the Mazda say, "F[***] you. F[***] you." just prior to the shooting; and denied telling anyone that the shooting started from the Mazda's front passenger seat.

Scotty George testified that he was at Shontae Handy's house on the evening of April 5. Later that night, Marcus Smith drove George and Tommy Walker to Wendy's in Smith's black Hyundai Scoupe. They went to the restaurant because George had left his keys in Chan Martin's car. George went into the restaurant and heard gunshots. He looked outside and saw a black Mazda 626 with fire coming out of the driver's side window. George was unable to see who was in the car but saw four heads. George did not know the [petitioner] but had seen the [petitioner] in the Mazda the previous night. After the shooting, George went into the parking lot and saw the Mazda pulling out of the lot. He walked over to the victim and helped roll him over onto his back. He stated that he saw only one person shooting the gun, and he later testified that the Mazda was dark green. On cross-examination, George testified that when he, Smith, and Walker arrived at Wendy's, Smith dropped George and Walker off at the restaurant. He said that he, the victim, Shaun Bullock, Smith, and Dante Johnson did not belong to a gang. He said that although he saw shots being fired from the driver's side of the Mazda, he did not see the shooter.

Tommy Walker testified that he was the victim's friend and was with the victim at Shontae Handy's house on April 5. At some point that evening, Chan Martin telephoned the victim and told him that "some guys up here trying to mess with me." After the call, Marcus Smith drove Walker and Scotty George to Wendy's. Another group of males also left Handy's house and drove in a separate car to the restaurant. When Smith pulled into the Wendy's parking lot, Walker saw someone reaching into Martin's car, saw the victim run toward Martin's car, and saw the [petitioner] start shooting. Walker stated that he was sitting in the backseat of Smith's car at the time of the shooting, that George was sitting in front of him, and that George never went

-5-

into Wendy's. He stated that he was able to see the Mazda 626 by looking out the back window of Smith's car. He stated that he heard more than three gunshots, that four or more people were in the Mazda, that Jeremy Love was sitting in the Mazda's front passenger seat, that the [petitioner] was sitting in Mazda's driver's seat, and that he saw the gun "come out of the car." He stated that he, the victim, and Shaun Bullock did not belong to a gang and that he had never had a confrontation with the [petitioner].

Officer Leslie Lynn of the Memphis Police Department testified that he responded to a "shots-fired call" at Wendy's on April 5. When Officer Lynn arrived, the victim was lying on his back and had a gunshot wound to the chest. Officer Lynn secured the scene and put witnesses into the backseats of patrol cars. Witnesses told Officer Lynn what had happened and who was responsible for shooting the victim. The witnesses were upset, angry, and screaming. Chan Martin told Officer Lynn that the [petitioner] shot the victim, and a girl named Tammy told Officer Lynn that she saw the victim confront the [petitioner] and saw shots fired. On cross-examination, Officer Lynn testified that he could not remember Tammy's last name.

Memphis Police Officer Ricky Davison testified that he found spent bullet casings in the Wendy's parking lot, a bullet hole in the windshield of Chan Martin's Grand Am, bullet holes in the east wall of Wendy's and in the restaurant's door, bullet fragments on the carpet in the restaurant, a key ring with two keys in the parking lot, and a bloodstain on the west side of the parking lot. Police officers found a total of eight spent shell casings in the parking lot and in the parking lot exit.

Dr. Thomas Deering testified that in April 2004, he was the interim Chief Medical Examiner for Shelby County and performed the victim's autopsy. The victim had a gunshot wound to the left chest. The bullet traveled through the victim's heart and right lung and struck a rib. The bullet perforated areas of the victim's heart, and the victim had an extensive amount of blood in his chest cavity. The victim tested negative for drugs and alcohol, and the cause of death was a gunshot wound to the chest. Dr. Deering recovered the bullet from the victim.

Servera Brown, the victim's mother, testified that the victim was not a gang member. She acknowledged that the victim had some difficulties in school and that he was expelled for one year for a fight. Brown stated that

although school officials believed the fight was gang-related, the victim was not a gang member.

Shelby County Sheriff's Department Officer Louis T. Hall, Jr., testified that on April 6, 2004, he and Sergeant Mark Miller went to the [petitioner]'s home to assist with a homicide investigation. At that time, the [petitioner] was a suspect in the victim's death. When the officers arrived, Officer Hall saw a green vehicle in the garage and a black Nissan pickup truck parked on the street. Officer Hall left the residence and went to a location on West Thunderstone Circle to investigate a call that a suspicious vehicle was in the area. When Officer Hall arrived at that location, someone told him that a black Nissan truck with a bumper missing had pulled up to the curb and that someone had dropped something into the storm drain. Officer Hall thought the information was "peculiar," looked into the drain, and found a plastic bag containing a .9 millimeter holster and a Styrofoam bullet holder. Officer Hall collected the evidence and turned it over to Sergeant Miller. On cross-examination, Officer Hall acknowledged that he could not say the holster was purchased specifically to hold a .9 millimeter gun.

Twenty-three-year-old Gregory Mathis, Jr., the [petitioner]'s older brother, testified that on April 6, 2004, police officers came to his mother's home at 7616 Iron Cove, where the [petitioner] lived with their mother. The [petitioner] was not home at the time, but Gregory Mathis was present. The police were looking for the [petitioner] and towed a green Mazda 626 from the property. Gregory Mathis' black Nissan pickup truck was parked outside, but he said nothing was wrong with the truck's bumper. He stated that the previous day, he had talked with the [petitioner] about the incident at Wendy's. He said that he did not remember the [petitioner]'s telling him to search the [petitioner]'s bedroom. Mathis stated that he did not search the [petitioner]'s bedroom but searched his mother's home and found a notebook, a bandana, a Styrofoam bullet container, and a plastic bag for a holster. Mathis acknowledged that he waived his rights and gave a statement to police on April 6. At first, Mathis testified that he did not remember telling the police he found the notebook, bandana, bullet container, and plastic bag in the [petitioner]'s bedroom. However, he later admitted finding the items there. Mathis said he put some of the items in a storm drain and that the police found the notebook and the bandana in his truck.

Gregory Mathis testified that he did not remember telling the police that the notebook had gang letters in it. When asked if the [petitioner] was a

member of a gang, Mathis said, "Not that I know of." He denied telling the police that he had heard the [petitioner] was a member of the Crips gang, but he acknowledged that the blue bandana had gang writing on it. He said he put some of the recovered items in the storm drain in order to help the [petitioner]. He said that he allowed the police to search his cellular telephone and that his telephone had a picture of a handgun stored in it. He said he owned the handgun.

On cross-examination, Gregory Mathis testified that he tried to hide some of the items in the storm drain because he was scared, confused, and concerned for the [petitioner]. He stated that the picture of the handgun stored in his cellular telephone was a picture of his gun, that it was a Smith and Wesson .45 caliber, and that he had a license to carry the weapon. He stated that he had no personal knowledge of the shooting on April 5, 2004, and that, to his knowledge, the [petitioner] never possessed his gun.

Officer Jimmy Chambers, who worked in the Gang Unit of the Shelby County Sheriff's Department, testified as an expert on gangs. He stated that the color blue usually represented the Crips gang and that gang members often wore bandanas in their pockets. He stated that the blue bandana found in this case looked like a gang "flag," that it had gang writing on it, and that he thought the writing said, "Rollin 20's Gangster Crip." He said the notebook police found also contained several pages of gang information. He said that if a gang member got into a fight, members of the gang often would retaliate against the other fighter. On cross-examination, Officer Chambers testified that he did not know the [petitioner].

Memphis Police Department Officer Stacy Milligan testified that he took photographs of the Mazda 626 after the police confiscated it. He said that bullet holes appeared to be in the vehicle and that the driver's side mirror had a bullet hole in it. Using a trajectory rod, the police concluded that the bullet came from behind the mirror. On cross-examination, Officer Milligan acknowledged that he was not a ballistics expert and that he did not know when the mirror was damaged. However, on redirect examination, he stated that the mirror's damage looked fairly new.

Special Agent Forensic Scientist Steve Scott with the Tennessee Bureau of Investigation (TBI) Firearms Identification Unit testified as a firearms expert that he tested bullet fragments recovered from the crime scene but could not tell anything about them. He also inspected the bullet recovered from the

victim and concluded that it was "consistent with being a .9 millimeter." However, he could not say conclusively that it was a .9 millimeter. He said he microscopically inspected the eight spent shell casings recovered from the crime scene and concluded that they were fired from the same gun.

Sergeant Connie Justice of the Memphis Police Department testified that she was called to Wendy's on April 5, 2004, to investigate a shooting and became the case coordinator. The next day, investigators went to the [petitioner]'s home and saw a Mazda 626 in the garage. The [petitioner] was at work, but officers spoke with the [petitioner]'s mother and confiscated the car. The car had a bullet hole through the driver's side mirror. The police had received information that the shooting was the result of a fight that had occurred one or two days earlier and was a retaliation for the fight. The [petitioner] became a suspect from witness statements and photographic identifications. The police eventually arrested the [petitioner] and charged him with first degree murder. On cross-examination, Sergeant Justice testified that she believed Tommy Walker identified the [petitioner] as the shooter and that he was the only witness she spoke with who made that identification. On redirect examination, she stated that she was aware other witnesses also had identified the [petitioner] as the shooter.

Memphis Police Officer T. Alexander testified for the [petitioner] that he responded to the shooting at Wendy's on April 5. According to a police report filed in the case, Shontae Handy stated that she heard a black male in a green Mazda say, "F[***] you. F[***] you." Handy told police that the shooting started from the Mazda's front passenger seat. On cross-examination, Officer Alexander acknowledged that he was not an investigator and did not talk with Shontae Handy personally. He also stated that he did not know if Handy's statement in the report was her formal statement.

Twenty-year-old Tamara Burrows testified that on the night of April 5, she drove her girlfriends to Wendy's in order to get something to eat. Burrows' car was near the parking lot exit between the restaurant and the Goodyear building next door. Burrows heard some vulgar language and heard gunshots. She said the shots came from the passenger seat of a green Mazda 626. Burrows saw the gun outside of the car and on top of the car's roof. She stated that she heard more than one shot and that the Mazda sped out of the parking lot. The next morning, Burrows gave a statement to the police. The police showed her a photographic array, but she could not identify anyone in the Mazda.

On cross-examination, Burrows acknowledged that she did not say anything in her statement about someone shooting over the Mazda's roof. She said she did not remember the color of the gun but acknowledged saying in her statement that the gun was black. She testified that the gun looked like a .9 millimeter. She acknowledged that in her statement to police, she said the shots "appeared" to come from the passenger seat. However, she testified that she was not absolutely sure where the shots came from in the Mazda. The jury convicted the [petitioner] of first degree premeditated murder.

*State v. Justin Mathis*, W2005-02903-CCA-R3CD, 2007 WL 2120190, at *1-7 (Tenn. Crim. App., at Jackson, July 20, 2007). The trial court sentenced the petitioner to life imprisonment.

On direct appeal, this court affirmed the judgment of the trial court. *Id.* at *1. On December 29, 2008, the petitioner timely filed a petition for post-conviction relief alleging ineffective assistance of counsel. On December 2 and 9, 2008, the post-conviction court held a hearing on the petition , and the parties presented the following evidence.

Eddie Heaston testified that he was a "9-1-1 police supervisor." He gathered the 9-1-1 records for this case at the request of the petitioner's post-conviction counsel. He stated that the incident concerned "the shooting that occurred at the Wendy's . . . on Shelby Drive." The caller told the 9-1-1 dispatcher that "someone had been shot at the Wendy's and the victim was a male that was still on the parking lot." Heaston had a copy of the chronology, which printed the calls 9-1-1 dispatchers received, for this incident. He stated that Loretha Thomas, one of the petitioner's witnesses gave him an address and phone number, and he matched the information to a call on the chronology. The chronology listed Douglas Thomas as the telephone account holder's name and the phone number and address associated with the account. He said that post-conviction counsel also requested the "conversation of the telephone, radio transmission"; however, they expunged those records after eighteen months.

According to Heaston, unless someone makes a special request, they destroy the recording of the 9-1-1 phone call after eighteen months. He said that the recordings were "freely available" to defense attorneys in a criminal trial and that it was "very common" for defense attorneys to request the recordings. He also said that defense attorneys "fairly frequently" retrieved the information about who called 9-1-1. Heaston was unsure whether defense counsel in this case requested the audio recordings and said that no records showed whether he did.

On cross-examination, Heaston testified that because no record showed whether trial counsel requested the audio recording for this case, it was possible that they made copies of the tape before they destroyed them. He further testified that there was no record of whether trial counsel requested a transaction log.

Loretha Thomas testified that she witnessed the April 5, 2004, shooting at Wendy's on East Shelby Drive. She stated that she and her husband were picking up her truck from Goodyear, which was next to the Wendy's. They were in separate vehicles, and she said that as they "were getting ready to access . . . Shelby Drive, [they] saw some guys come out of the Wendy's and [she] didn't know what was going on, but it didn't look like it was going to be good." Loretha[1] said that three or four young men came out of the Wendy's like they were going to have an altercation and approached a green vehicle. She thought that something was going to happen because they were talking loudly in a confrontational manner and because of their "hand motions." Loretha further testified that the green vehicle "was driving forward and as the car was driving forward . . . the guy that was on the passenger side . . . reached a gun out and just started shooting." She said that she honked her horn at her husband and put her vehicle in reverse. However, "before [she] backed up [she] saw this guy just fall. And [she] could tell that he had died, because he just fell lifeless." She stated that at the time of the shooting, the men whom she had seen coming out of the Wendy's were approximately twenty feet away from the green vehicle.

Loretha said that she and her husband drove home and called 9-1-1 when they arrived. She told the dispatcher that she thought she had witnessed a shooting, and she said that the dispatcher told her that they had received several calls reporting the shooting. Loretha verified the phone number and address from which she placed the 9-1-1 call, and she also verified the person under whose name the phone number was registered.

Loretha identified an overhead photograph of the Wendy's where the shooting occurred. She marked where her vehicle, her husband's vehicle, and the shooter's vehicle were at the time of the shooting. She said that she had no doubt that the passenger fired the gun because her "husband was right there and [she] was afraid that he could have gotten shot, if [the shooter] shot any more wildly." She said that she saw fire come from the nozzle of the gun. She did not see anyone else with firearms nor did she see anyone else shooting. Loretha stated, "[A]ll I can vividly remember is the passenger's arm coming out of the window."

---

[1] More than one witness has the last name Thomas. We will refer to them by their first names to avoid confusion and do not intend any disrespect.

Loretha and her husband moved to Cordova, Tennessee, the June after the shooting. She said that they had their mail forwarded to her new address, and the utilities were in her husband's name, as they were at her previous address. She and her husband stayed at this address for approximately one year until they moved again within Cordova. She said that they again had their mail forwarded and the utilities transferred.

Loretha stated that she would have testified at the petitioner's trial if trial counsel had asked her. She said that nothing "made it unusually difficult for somebody to locate [her], or talk to [her]." She said that she found out about the petitioner's case after she was talking to a woman about why she had moved. She told the woman about shootings in the area. She also told her that she had witnessed a shooting and no one had ever contacted her about it. An investigator called Loretha because of that conversation, and she told him about the incident. The investigator also called Loretha's husband, Douglas, and spoke with him about the incident.

On cross-examination, Loretha testified that she spoke with the woman about witnessing the shooting a little more than five years after it happened. She reviewed the aerial photograph of Wendy's and stated that the driver's side of the green vehicle was facing Wendy's. She said that the person in the passenger side fired "back and over the car." She agreed that in order for the shot to have come from the passenger side "it had to be up in the air, and over the hood, almost like [he was] stretching."

Loretha stated that it was dusk when the shooting occurred. She could hear the men that came out of Wendy's saying something, but she could not understand exactly what they were saying. She said that she was sure that she called from her land-line telephone at home. She said that she told the 9-1-1 operator that she "saw several subjects go to a green vehicle . . . . Responsible subject was wearing a white sweater cap, but she only saw the back of the subject's head." She agreed that she did not mention the passenger to the operator and "just specified that [she] saw a shooting."

Loretha said that she and her husband kept the same landline telephone number when they moved. A couple of months after the shooting, Loretha and her husband moved from the home at which they were living during the shooting to a house in Cordova, from the house in Cordova to an apartment, and from that apartment to her apartment at the time of the hearing.

On redirect examination, Loretha explained that the subject in the white hat was the victim of the shooting. She further explained that when she said the shooter shot over the hood of the vehicle, she meant the roof of the vehicle and not what covered the engine.

-12-

Douglas Thomas testified that on April 5, 2004, he took his wife to pick up her vehicle from a repair shop next to Wendy's on East Shelby Drive. He said that

> as [he] was coming out, there was another vehicle, [and he] could see some kids. [He saw] a car that was [going] to the exit too, as [he] was [going] there. [He] was right beside him and . . . saw some kids kind of walking, casually, towards the car. [He] could hear them screaming, but [he] couldn't understand, or hear what they [were] saying[.] [They were] throwing signs and just acting aggressively.

He explained that the signs they threw were "the middle finger sign and stuff like that." Douglas was waiting for traffic to clear so he could exit the parking lot, and he said that, while he was waiting, a man on the passenger side of the vehicle put his hand out of the window and started shooting. He said that his wife had their children in her vehicle so they "got out of there . . . because [he] didn't know if anybody was going to . . . return[] the shooting." Douglas was four or five feet from the shooter but could not see the driver of the vehicle. He did not see anyone else shooting or any other firearms.

Douglas said that once him and his wife left the scene, he had his wife call 9-1-1 from their home. He verified their home address and telephone number from which she made the call. He said that he thought the phone number was in his name and said that their light, gas, and water utility bill was in either his name or his wife's. Douglas stated that he and his wife moved to Cordova the June or July following the shooting and lived at the new home for a year. He stated that they then lived in an apartment in Cordova for approximately one year, and then moved to the apartment in which they were living during the hearing. They had their mail forwarded and utilities transferred each time they moved.

Douglas identified the aerial photograph of the Wendy's and identified where his vehicle, his wife's vehicle, and the shooter's vehicle were during the shooting. He said that the shooter was in a green Toyota Camry, but he was unsure of the color because it was dark.

On cross-examination, Douglas testified that he "saw an arm go up, out of the window, over the top of the car and fire across the roof of the car." He further testified that the victim was going toward the driver's side. He and his wife did not have any further contact with the police after his wife called 9-1-1. On redirect examination, Douglas testified that no one contacted him about the incident until a couple of months before the hearing.

Clark Chapman testified that he had been a private investigator for approximately eleven years. He primarily did work in Shelby County, Tennessee, for defense attorneys. He had investigated more than 100 murder cases and worked with between 30 and 40

-13-

attorneys. He stated that in murder cases he usually subpoenaed 9-1-1 recordings and call logs. He listened to the recordings to compare what the witness told the operator and the defendant's version of events. He would also talk to the witness who called 9-1-1. He said he found the witnesses who called 9-1-1 by retrieving their phone numbers from the 9-1-1 call log. If a witness did not answer, Chapman would subpoena their telephone provider for their phone records or the application for telephone service, which contained the account holder's employment and other contact information. Likewise, he would subpoena Memphis Light, Gas, and Water (MLGW) utility records to find witnesses. He stated that he would subpoena MLGW's resident utility connection, which included records of service transfers. He said that he also used tax assessor's records and other public records to find witnesses.

On cross-examination, Chapman agreed that finding a witness would be more difficult if the witness moved and established the utility service at the new address in their spouse's name rather than transfer the service with the previous account holder's name. When asked whether it would be even more difficult to find a witness who moved a second time, Chapman answered that it depended on which database he used. He stated that utility records contained the witnesses' social security numbers and dates of birth, which allowed him to find the witnesses through different avenues.

On redirect examination, Chapman stated that if a witness moved and kept the same utility account, finding the witness would not be hard. He further stated that although it would be more difficult if a witness moved a couple of times and did not transfer his or her utility service, he could still find the witness.

Trial counsel testified that he had been a lawyer in Tennessee since 1973. He primarily practiced in Shelby County and his cases were 85% criminal defense work. During his career he tried between fifteen and twenty murder cases. He represented the petitioner during his first degree murder trial and direct appeal. He tried to find the file from the petitioner's trial, but after "a thorough and exhaustive search" he was unable to find it.

Trial counsel did not remember whether there were 9-1-1 calls, tapes, or logs, but he said that he recalled that the police reports mentioned witnesses who made 9-1-1 calls. Trial counsel said that he believed he and his co-counsel challenged the qualifications of the police officer who testified as a gang expert. He denied that the gang expert testified specifically that the petitioner was in a gang, but agreed that witnesses testified during the trial that the petitioner was possibly in a gang and the shooting possibly being gang related. Trial counsel recalled testimony about a bandana that was found either in the petitioner's possession or in his room. When asked why he did not object to the admission of the gang evidence based on Rule 404 or 404 (b) of the Tennessee Rules of Evidence, trial counsel answered,

I don't know if I thought at the time that is was necessary. We objected to it on the relevancy basis and I . . . probably thought that that was sufficient to make the record on this case at that time. In addition to that, . . . sometimes from a strategy point of view, you're putting on all of this proof regarding gang activities and gang membership that I didn't think was applicable to my client. And sometimes you want to argue that the State has put on all of this irrelevant information and testimony to try to make a case where none existed. So you have all of those things weighing in the balance as to whether it's more effective to try to point out to the jury that they're trying to create a case where none existed or objecting to it and realizing that they're not mutually exclusive. I objected to it on the one hand and then made the argument on the other hand.

Trial counsel further stated that he did not believe that the state presented "strong evidence" of the petitioner's gang membership. Trial counsel raised the issue of 404(b) bad character evidence in his brief, but did not present any argument "in the hopes of trying to get whatever relief" he could for the petitioner.

Trial counsel testified that he did not consider raising a self-defense argument or asking for a self-defense instruction because he did not think a factual basis existed to support a claim of self-defense. He stated that during deliberations, the jury submitted a question to the court and, in response, the court reread portions of the instruction it had given the jury. He stated that he did not ask the court to address the jury's question further because the jury instructions covered all of the elements along with definitions and pertinent terms. He stated that "[f]rom a defense point of view, the time to raise the question regarding the sufficiency of jury instructions is before the instructions are given." Trial counsel further stated that he did not see the need to ask for additional instructions.

On cross-examination, trial counsel testified that without the benefit of the petitioner's file, he could not specifically recall every detail of the petitioner's trial. He said that he "strenuously" objected to Officer Chambers' testimony concerning gangs under the relevancy ground because he did not think that Officer Chambers "was qualified as an expert to give his opinion regarding the testimony that he gave." Trial counsel said that he not only objected to Officer Chambers' testimony "on specific occasions," he also "asked for a continuing objection to his testimony of the grounds of relevancy and lack of qualifications."

Trial counsel testified that he did not feel that there was a factual basis to pursue a self-defense argument because

[t]he testimony was that [the victim] came up. He was a passenger in a vehicle driven by someone else. He jumped out of the car and there was some

-15-

vandalism or damage that had been done to a parked car. He jumped out and ran toward [the petitioner's] vehicle with his fist balled up yelling obscenities when the shooting took place.

Trial counsel recalled that between eight and twelve witnesses testified, and none of the witnesses testified that the victim had a weapon.

Trial counsel thought that he and his co-counsel did everything that they could for the petitioner. Trial counsel recalled that there were discrepancies in the witnesses' testimony regarding from where the shooter fired the shots. He said that some witnesses testified that there were two shooters, and he and his co-counsel "tried to persuade the jury that this victim's death could have been caused by the passenger as opposed to [the petitioner]." Trial counsel stated that the state was "real strong on the criminal responsibility theory," and the trial judge instructed the jury on criminal responsibility. He said the state's argument was that "even if [the petitioner] was not the actual shooter responsible for the death, he was acting in concert with everybody else that was in that vehicle and he was just as responsible for what happened if he had in fact been the one who shot [the victim.]"

After hearing the proof, the post-conviction court took the matter under advisement. On February 24, 2010, the post-conviction court entered an order denying the petition for post-conviction relief. In its order, the court found that the petitioner failed to prove by clear and convincing evidence that trial counsel was ineffective and denied the petitioner post-conviction relief. The petitioner appeals the court's denial of post-conviction relief.

**Analysis**

In his petition for post-conviction relief, the petitioner argued that trial counsel was ineffective for failing to: (1) make a proper objection, under Tennessee Rules of Evidence 403 and 404 (b), to the evidence regarding the petitioner's gang affiliation; (2) properly raise the issue of the petitioner's gang membership on appeal; (3) object to the court's rereading the jury instructions; (4) make a proper investigation of the circumstances surrounding the shooting of the victim; (5) present witnesses in support of a self-defense retaliation claim; and (6) request a jury instruction on self-defense. However, on appeal, the petitioner only argues the single issue of "[w]hether trial counsel was ineffective in failing to find and interview two potential defense witnesses, who would have very credibly supported the defense theory of the case, refuted the State's theory of the case, and bolstered and argument for self-defense."

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn.

Code Ann. § 40–30–110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is *de novo* with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457–58 (Tenn. 2001).

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697; *see also Goad*, 938 S.W.2d at 370. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Strickland*, 466 U.S. at 697.

The petitioner contends that trial counsel should have investigated the 9-1-1 calls. According to the petitioner, "such and investigation of even a perfunctory nature would have led directly to the current phone number of two completely reliable and disinterested witnesses who directly witnessed the crime at a closer distance than anyone else, and who could [have] definitively answered what the Court of Criminal Appeals itself identified as the main issue in the case, the shooter's identity." The petitioner asserts that because the identity of the shooter was the main issue, counsel's failure to investigate these witnesses prejudiced him.

The post-conviction court found that the petitioner failed to show that trial counsel's failure to investigate the 9-1-1 records and trial counsel's failure to discover Loretha and Douglas Thomas as defense witnesses prejudiced him. The post-conviction court stated that even if the jury had believed Loretha and Douglas Thomas's testimony that they saw the passenger shooting, "the [p]etitioner did not present evidence that the jury would have discredited the criminal responsibility theory." Regarding the petitioner's claim of self-defense, the post-conviction court found that the petitioner failed to demonstrate that Loretha and Douglas Thomas's testimony would have furthered his self-defense theory.

We conclude that the evidence does not preponderate against the post-conviction court's findings. The evidence at the post-conviction hearing showed that Loretha and Douglas Thomas saw the passenger shoot the victim. Although this testimony rebuts an assertion that the petitioner was the shooter, it does not rebut the fact that the petitioner aided the passenger's shooting the victim and went to Wendy's with the requisite intent to harm the victim. Regarding the petitioner's claim that the witnesses' testimony would have bolstered his self-defense theory, the witnesses testified that the only person shooting was the passenger and no one else was armed. There was no evidence that the petitioner was imminently threatened with force or actually attacked in support of his claim of self-defense. Accordingly, we conclude that the petitioner has failed to show prejudice, thus he is not entitled to post-conviction relief.

### Conclusion

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
J.C. McLIN, JUDGE